## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| **VANESSA CORBITT,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:20-cv-771-CWB** |
| | ) | |
| **KILOLO KIJAKAZI,[1]** | ) | |
| **Acting Commissioner of** | ) | |
| **Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

### I.    Introduction and Administrative Proceedings

Vanessa Corbitt ("Plaintiff") filed an application for Disability Insurance Benefits under Title II on October 24, 2018 wherein she alleged a disability onset of June 1, 2018 due to bipolar disorder, memory deficits, hypothyroid, panic attacks, high blood pressure, and arthritis of the left knee.  (Tr. 15, 48-49, 64).[2]  The claim was denied at the initial level on January 24, 2019, and Plaintiff requested *de novo* review by an administrative law judge ("ALJ").  (Tr. 15, 66, 71-75). The ALJ subsequently heard the case on February 10, 2020, at which time testimony was given by Plaintiff (Tr. 15, 30-41) and by a vocational expert (Tr. 42-46).  The ALJ took the matter under advisement and issued a written decision on March 4, 2020 that found Plaintiff not disabled. (Tr. 15-26).  The ALJ's written decision contained the following enumerated findings:

---

[1]  Kilolo Kijakazi became Acting Commissioner for the Social Security Administration on July 9, 2021 and is automatically substituted as a party pursuant to Fed. R. Civ. P. 25(d).

[2]  References to transcript pages are denoted by the abbreviation "Tr."

1.  The claimant last met the insured status requirements of the Social Security Act on December 31, 2019.

2.  The claimant did not engage in substantial gainful activity during the period from her alleged onset date of June 1, 2018 through her date last insured of December 31, 2019 (20 CFR 404.1571 *et seq.*).

3.  Through the date last insured, the claimant had the following severe impairments: bipolar disorder, major depressive disorder/depression, generalized anxiety disorder/anxiety, somatic symptom disorder, epilepsy/seizure disorder, and patellofemoral chondromalacia (20 CFR 404.1520(c)).

4.  Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526).

5.  After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) except she can frequent balance, stoop, crouch, crawl, kneel, and climb, but never on ladders, ropes, or scaffolds; she must avoid all exposure to hazards, including moving machinery and unprotected heights; she can do simple routine tasks but no complex tasks, in a low-stress work environment defined as occasional decision making and occasional changes in work setting, occasional interaction with the public, coworkers, and supervisors, no interaction with public, and no fast-paced production work such as conveyor belt or quota-based work.

6.  Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7.  The claimant was born on January 6, 1965 and was 55 years old, which is defined as an individual closely approaching advanced age, on the date last insured (20 CFR 404.1563).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in

significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

11. The claimant was not under a disability, as defined in the Social Security Act, at any time from June 1, 2018, the alleged onset date, through December 31, 2019, the date last insured (20 CFR 404.1520(g)).

(Tr. 17-18, 20, 24-25, 26).

On July 30, 2020, the Appeals Council denied Plaintiff's request for review (Tr. 1-5), thereby rendering the ALJ's decision the final decision of the Commissioner. *See, e.g., Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).

On appeal, Plaintiff asks the court to reverse the final decision and to award benefits or, alternatively, to remand the case for a new hearing and further consideration. (Doc. 1 at p. 2; Doc. 14 at p. 15). As contemplated by 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure, the parties have consented to entry of final judgment by a United States Magistrate Judge (Docs. 9 & 10), and the undersigned finds that the case is now ripe for review pursuant to 42 U.S.C. § 405(g). Upon consideration of the parties' submissions, the relevant law, and the record as a whole, the court concludes that the final decision is due to be AFFIRMED.

## II.   Standard of Review and Regulatory Framework

The court's review of the Commissioner's decision is a limited one. Assuming the proper legal standards were applied by the ALJ, the court is required to treat the ALJ's findings of fact as conclusive so long as they are supported by substantial evidence. 42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997). "Substantial evidence is more than a scintilla," but less than a preponderance, "and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004) ("Even if the evidence preponderates against the Commissioner's findings, [a reviewing court] must affirm if the decision reached is supported by substantial evidence.")

(citations omitted).  The court thus may reverse the ALJ's decision only if it is convinced that the decision was not supported by substantial evidence or that the proper legal standards were not applied.  *See Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991).  However, reversal is not warranted even if the court itself would have reached a result contrary to that of the factfinder.  *See Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).  Despite the deferential nature of its review, the court must look beyond those parts of the record that support the decision, must view the record in its entirety, and must take account of evidence that detracts from the evidence relied on in the decision.  *See Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986); *see also Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

To qualify for disability benefits and establish entitlement for a period of disability, a person must be unable to:

> engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A).[3]  To make such a determination, the ALJ employs a five-step sequential evaluation process.  *See* 20 C.F.R. §§ 404.1520 & 416.920.

(1) Is the person presently unemployed?

(2) Is the person's impairment severe?

(3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1 [the Listing of Impairments]?

(4) Is the person unable to perform his or her former occupation?

(5) Is the person unable to perform any other work within the economy?

---

[3] A "physical or mental impairment" is one resulting from anatomical, physiological, or psychological abnormalities that are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.  42 U.S.C. § 423(d)(3).

An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).[4]

The burden of proof rests on the claimant through step four. *See Phillips v. Barnhart*, 357 F.3d 1232, 1237-39 (11th Cir. 2004); *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003). A claimant establishes a *prima facie* case of a qualifying disability once he or she has carried the burden of proof from step one through step four. *Id*. At step five, the burden shifts to the Commissioner, who must then show that there are a significant number of jobs in the national economy that the claimant can perform. *Id*.

In order to assess the fourth and fifth steps, the ALJ must determine the claimant's Residual Functional Capacity ("RFC"). *Phillips*, 357 F.3d at 1238-39. The RFC is what the claimant is still able to do despite the claimant's impairments and is based on all relevant medical and other evidence. *Id*. It may contain both exertional and nonexertional limitations. *Id*. at 1242-43. At the fifth step, the ALJ considers the claimant's RFC, age, education, and work experience to determine if there are jobs available in the national economy that the claimant can perform. *Id*. at 1239. To do so, the ALJ can use either the Medical Vocational Guidelines ("grids"), *see* 20 C.F.R. pt. 404 subpt. P, app. 2, or call a vocational expert ("VE"). *Id*. at 1239-40. The grids allow the ALJ to consider factors such as age, confinement to sedentary or light work, inability to

---

[4] *McDaniel* is a Supplemental Security Income case. Nonetheless, the same sequence applies to claims for disability insurance benefits brought under Title II. SSI cases arising under Title XVI therefore are appropriately cited as authority in Title II cases, and vice versa. *See, e.g., Ware v. Schweiker*, 651 F.2d 408, 412 (5th Cir. 1981); *Smith v. Comm'r of Soc. Sec.*, 486 F. App'x 874, 876 n.* (11th Cir. 2012) ("The definition of disability and the test used to determine whether a person has a disability is the same for claims seeking disability insurance benefits or supplemental security income.").

speak English, educational deficiencies, and lack of job experience.  Each factor can independently limit the number of jobs realistically available to an individual, and combinations of these factors yield a statutorily-required finding of "Disabled" or "Not Disabled."  *Id*. at 1240.

## III.    Issues on Appeal

Plaintiff raises three issues on appeal: (1) whether substantial evidence supports the ALJ's RFC determination; (2) whether the ALJ properly evaluated the prior administrative medical finding of non-examining state medical consultant Thomas G. Amason, M.D.; and (3) whether the ALJ properly evaluated Plaintiff's diagnosis of mild neurocognitive disorder.  (Doc. 14 at p. 1).

## IV.    Discussion

### A.    The RFC Determination

An RFC determination is an assessment of what a claimant is still able to do despite the claimant's impairments and is based on all relevant medical and other evidence.  *Phillips*, 357 F.3d at 1238-39; *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir.1997); 20 C.F.R. § 404.1545(a) ("Your residual functional capacity is the most you can still do despite your limitations.").  "[T]he task of determining a claimant's [RFC] and ability to work rests with the [ALJ], not a doctor." *Moore v. Soc. Sec. Admin., Comm'r*, 649 F. App'x 941, 945 (11th Cir. 2016); *Hollingsworth v. Comm'r of Soc. Sec.*, 846 F. App'x 749, 753 (11th Cir. 2021) ("A claimant's RFC is a matter reserved for the ALJ's determination, and while a physician's opinion on the matter is considered, it is not dispositive."); *Frank v. Comm'r of Soc. Sec.*, No. 2:20-CV-962, 2022 WL 598036, at *8 (M.D. Fla. Feb. 10, 2022), *report and recommendation adopted*, No. 2:20-CV-962, 2022 WL 596833 (M.D. Fla. Feb. 25, 2022) ("[T]here is no requirement that an ALJ base the RFC finding on a medical source's opinion."); *Tolbert v. Kijakazi*, No. 3:21-CV-33, 2022 WL 4591646, at *2 (M.D. Ala. Sept. 29, 2022) ("An ALJ may 'distill a claimant's RFC from an amalgamation of the

record as a whole, without requiring a specific medical opinion to articulate a specific functional limitation.'") (citation omitted).

Plaintiff contends that the ALJ's determination of RFC is not based on substantial evidence, citing as reasons: (1) that the ALJ's determination was internally inconsistent and (2) that the ALJ improperly evaluated the medical findings of Robert Estock, M.D., a non-examining State agency psychological consultant.  (Doc. 14 at pp. 7-10).

"To find that an ALJ's RFC determination is supported by substantial evidence, it must be shown that the ALJ has 'provide[d] a sufficient rationale to link' substantial record evidence 'to the legal conclusions reached.'"  *Eaton v. Colvin*, 180 F. Supp. 3d 1037, 1055 (S.D. Ala. 2016) (citations omitted).  Although an RFC determination must be supported by substantial evidence, the ALJ "is not required to specifically address every aspect of an opinion or every piece of evidence in the record" in order for the determination to be affirmed.  *Coley v. Comm'r of Soc. Sec.*, 771 F. App'x 913, 917 (11th Cir. 2019); *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005) ("[T]here is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as the ALJ's decision … is not a broad rejection which is 'not enough to enable [the district court ...] to conclude that [the ALJ] considered [the claimant's] medical condition as a whole.'") (citation omitted).  Moreover, "to find that the ALJ's RFC assessment is supported by substantial evidence, it is not necessary for the ALJ's assessment to be supported by the assessment of an examining or treating physician."  *Smoke v. Kijakazi*, No. CV 21-0206, 2022 WL 721532, at *4 (S.D. Ala. Mar. 9, 2022).

### 1.    Inconsistency of the RFC Determination

Plaintiff argues that the discussion of Plaintiff's interaction with the public in the RFC is inconsistent so as to leave Plaintiff and a reviewing court unable to determine what the ALJ

actually intended with regard to her ability to interact with the public and that the case therefore should be remanded for clarification by the ALJ.  (Doc. 14 at p. 8).  Specifically, Plaintiff cites to the portion of the RFC that states that she is limited to "**occasional** interaction with the public, coworkers, and supervisors, **no** interaction with public … ."  (Tr. 20) (emphasis added).

"To the extent that an ALJ commits an error, where the error did not affect the ALJ's ultimate determination, the error is harmless."  *Laurey v. Comm'r of Soc. Sec.*, 632 F. App'x 978, 986 (11th Cir. 2015) (citing *Diorio v. Heckler*, 721 F.2d 726, 728 (11th Cir. 1983)).  Further, "[r]emand is unnecessary when it would amount to a waste of judicial resources in the face of an ample record."  *Iordan v. Comm'r, Soc. Sec. Admin.*, 579 F. App'x 775, 779 (11th Cir. 2014).  Here, in assessing the medical record, the ALJ noted that Plaintiff reported lashing out at others due to irritability, that she expressed fear over going to a Christmas party, and that she reported being self-conscious about how others viewed her.  (Tr. 23).  Based upon this and other evidence, the ALJ found that Plaintiff was limited to "occasional interaction with supervisors and coworkers and <u>no</u> interaction with the public."  (Tr. 23) (emphasis added).  Thus, the ALJ's inclusion of the phrase "occasional interaction with the public" in the RFC appears to be a scrivener's error.

Moreover, in a hypothetical question to the VE, the ALJ included the limitation of "occasional interaction with [the] public."  (Tr. 42).  The VE responded that although such an individual could not perform Plaintiff's past relevant work, there were other jobs existing in the national or regional economy that such an individual could perform, such as janitor, laundry worker, and dishwasher—the same three jobs that the ALJ ultimately identified at step five of the sequential evaluation.  (Tr. 25, 43).  The ALJ then asked the VE what the effect would be on those jobs if the individual also had the limitation of "no interaction with the public."  (Tr. 43).  The VE answered that "[a]ll three positions would remain without erosion or change in numbers."

(Tr. 43). Thus, based on the VE's testimony, the availability of those jobs was not dependent on whether Plaintiff was limited to occasional or to no interaction with the public. Therefore, any error made by the ALJ by including both limitations in the RFC was harmless as it did not affect the ALJ's ultimate determination.

Accordingly, from a reading of the ALJ's decision as a whole and from the dialogue between the ALJ and the VE at the hearing, the inclusion of both limitations in the RFC was merely a scrivener's error, which was harmless because it did not affect the ALJ's ultimate determination. *See McQueen v. Colvin*, No. 2:11CV427, 2013 WL 3854485, at *5 n.6 (M.D. Ala. July 25, 2013) (noting that inconsistent limitations in ALJ's RFC would likely be harmless, as the ALJ's hypothetical question to the vocational expert included the more restrictive limitation); *see also Branon v. Comm'r of Soc. Sec.*, 539 F. App'x 675, 678-79 (6th Cir. 2013) (holding that inconsistent limitations in the ALJ's RFC was harmless because hypothetical questions posed to the VE were clear and included all relevant limitations).

### 2. Evaluation of Dr. Estock's Prior Administrative Finding

Plaintiff contends that the ALJ's re-wording of the limitations provided by Dr. Estock materially changed the meaning of such limitations, rendering the RFC at odds with the opinion of Dr. Estock, whom the ALJ found persuasive. (Doc. 14 at p. 8). Plaintiff's contention is comprised of two parts: (1) that the ALJ's limitation to "tasks" is materially different from Dr. Estock's limitation regarding "instructions;" and (2) that Dr. Estock's limitation regarding the quality and proximity of interaction that Plaintiff can maintain is materially different from the ALJ's limitations in the RFC, which only addresses the quantity of interaction. (*Id*. at pp. 8, 10).

The portion of the RFC being contested provides that Plaintiff is able to "do simple routine tasks but no complex tasks, in a low-stress work environment defined as occasional decision

making and occasional changes in work setting, occasional interaction with the public, coworkers, and supervisors, no interaction with public, and no fast-paced production work such as conveyor belt or quota-based work."  (Tr. 20).  In evaluating Dr. Estock's opinion, the ALJ stated:

> Robert Estock, MD, a state agency reviewing psychiatrist, opined that the claimant could learn simple work routines with practice; she could understand, remember, and carry out simple instructions but not detailed ones; she could sustain attention to simple tasks for two-hour periods in an eight-hour day with normal breaks; she would function best in a stable work environment without close proximity to others; contact with the public should be limited and non-intensive; contact with coworkers should be casual; she could adapt to infrequent, well-explained changes in the work environment (Ex. B1A/13-14). This is generally persuasive, and the limitations in the residual functional capacity above, while worded differently, are consistent with the limitations proposed by Dr. Estock. Dr. Estock supported his opinions by citing relevant evidence, including the claimant's mental health treatment records, which generally noted no serious mental status abnormalities, and the mild cognitive symptoms associated with the claimant's seizure disorder (Ex. B1A/10-11). Furthermore, Dr. Estock's opinions are consistent with the results of the psychological evaluation performed on April 30, 2019 (Ex. B15F). While this evaluation revealed deficits in cognition, memory, and behavior, the claimant demonstrated sufficient mental functioning to tolerate simple, routine tasks performed in a low stress environment with limited social interaction.

(Tr. 23-24).

### a.    Lack of Limitation as to Instructions

As to Plaintiff's first contention, Plaintiff argues that while the ALJ limited her ability to perform "tasks," Dr. Estock limited her ability to understand, remember, and carry out "instructions" and that tasks and instructions are not the same thing.  (Doc. 14 at p. 8).  Plaintiff asserts that the distinction between tasks and instructions is material, as Dr. Estock opined that Plaintiff "could understand and remember simple 1-2 step instructions but not detailed ones" and that had the ALJ not re-worded this limitation, the jobs found at step five would have been precluded.  (*Id*. at p. 9, citing Tr. 60).

As stated previously, the ALJ—and not a doctor—has the duty to determine a claimant's RFC.  *Moore*, 649 F. App'x at 945.  Thus, an ALJ "is not required to base[] [the] RFC on a doctor's

opinion." *McCarver v. Comm'r of Soc. Sec.*, No. 4:20-CV-1053, 2022 WL 860190, at *6 (N.D. Ala. Mar. 22, 2022) (citing *Castle v. Colvin*, 557 F. App'x 849, 853-54 (11th Cir. 2014)); *Vilches v. Kijakazi*, No. 3:21-CV-15, 2022 WL 11455775, at *2 (M.D. Ala. Oct. 19, 2022) ("Indeed, 'an ALJ's RFC assessment need not match or mirror the findings or opinions of any particular medical source ... because the reasonability of assessing the RFC rests with the ALJ.'") (citation and internal quotation marks omitted).  While state agency medical or psychological consultants are considered experts in Social Security disability evaluation, "[a]dministrative law judges are not required to adopt any prior administrative findings, but they must consider this evidence according to §§ 404.1520b, 404.1520c, and 404.1527, as appropriate."  20 C.F.R. § 404.1513a(b)(1).  The regulations further provide that the Commissioner "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's own] medical sources." 20 C.F.R. § 404.1520c(a).  "Thus, an ALJ need not adopt every part of an opinion that the ALJ finds persuasive." *Rivera Misla v. Comm'r of Soc. Sec.*, No. 6:20-CV-1076, 2021 WL 2417084, at *2 (M.D. Fla. June 14, 2021); *Vilches*, 2022 WL 11455775, at *3 ("Moreover, the ALJ provides an RFC by considering the entirety of the evidence rather than a single opinion—not simply regurgitating in the RFC from even persuasive medical opinions, and some slight deviation may be appropriate.").  *See also Szoke v. Kijakazi*, No. 8:21-CV-502, 2022 WL 17249443, at *9 n.12 (M.D. Fla. Nov. 28, 2022) (collecting cases).  Nor is an ALJ "compelled to 'specifically refer to every piece of evidence in his decision.'" *Szoke*, No. 8:21-CV-502, 2022 WL 17249443, at *9 (citation omitted).

In evaluating the persuasiveness of the medical opinion(s) or prior administrative medical finding(s), "[the agency] will consider those medical opinions or prior administrative medical

findings from that medical source together using" the following factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors that "tend to support or contradict a medical opinion or prior administrative medical finding."  20 C.F.R. § 404.1520c(a), (c).  "The most important factors ... [used to] evaluate the persuasiveness of medical opinions and prior administrative medical findings are supportability ... and consistency." 20 C.F.R. § 404.1520c(a), (b)(2); *Simon v. Kijakazi*, No. 8:20-CV-1650, 2021 WL 4237618, at *3 (M.D. Fla. Sept. 17, 2021).  Therefore, "the ALJ must explain how he or she considered the supportability and consistency factors." *Wynn v. Kijakazi*, No. 8:20-CV-2862, 2022 WL 1115296, at *4 (M.D. Fla. Apr. 14, 2022).  "The ALJ must explain in his decision how persuasive he finds a medical opinion and/or a prior administrative medical finding based on these two factors." *Nix v. Saul*, No. 4:20-CV-00790, 2021 WL 3089309, at *6 (N.D. Ala. July 22, 2021) (citing 20 C.F.R. § 404.1520c(a)-(c)).  "However, the ALJ need not use any magic words in discussing whether a medical opinion is supported by evidence from the medical source himself and whether the opinion is consistent with other evidence of record." *Thaxton v. Kijakazi*, No. 1:20-CV-00616, 2022 WL 983156, at *8 (M.D. Ala. Mar. 30, 2022); *Williamson v. Kijakazi*, No. 2:20-CV-772, 2022 WL 2257050, at *3 (M.D. Ala. June 23, 2022).  Moreover, "'[t]he ALJ may but is not required to explain how he considered the other remaining factors.'" *Id*. at *4 (citation omitted); 20 C.F.R. § 404.1520c(b)(2).  And the ALJ is "not required to articulate how [he] considered evidence from nonmedical sources."  20 C.F.R. § 404.1520c(d).  Further, "[t]he ALJ is under no obligation to 'bridge' every piece of evidence he finds inconsistent with a specific opinion. ... Nothing requires the ALJ to discuss every piece of evidence so long as the decision does not broadly reject evidence in a way that prevents meaningful judicial review." *Gogel v. Comm'r of*

*Soc. Sec.*, No. 2:20-CV-366, 2021 WL 4261218, at *9 (M.D. Fla. Sept. 20, 2021) (citations omitted).

Here, the ALJ found that Dr. Estock's opinion was "generally persuasive" and that the limitations in the RFC, "while worded differently," were "consistent"—not identical—with the limitations proposed by Dr. Estock.  (Tr. 23).  The ALJ was under no obligation to adopt verbatim Dr. Estock's opinion.  "By merely finding a medical source's opinion 'generally persuasive,' an ALJ does not abdicate their authority—and obligation—to reach an RFC determination based on a thorough review of the entire evidentiary record." *Vilches*, 2022 WL 11455775, at *3 n.2.  Thus, "[a]n ALJ does not properly discharge [his or] her duty by finding a single medical opinion persuasive and then deferring verbatim to that physician's findings." *Id*.  Therefore, an "ALJ need not adopt every part of an opinion that the ALJ finds generally persuasive." *Id*.  *See Freyhagen v. Comm'r of Soc. Sec. Admin.*, No. 3:18-CV-1108, 2019 WL 4686800, at *8 (M.D. Fla. Sept. 26, 2019) ("[T]he ALJ's RFC assessment did not need to match or mirror the findings or opinions of any particular medical source . . because the responsibility of assessing the RFC rests with the ALJ."); *Tolbert*, 2022 WL 4591646, at *2 ("There is no requirement that an ALJ include every limitation from a medical opinion verbatim in an RFC determination or specifically address every aspect of an opinion or every piece of evidence in the record."); *Powell v. Kijakazi*, No. CV 321-066, 2022 WL 4000719, at *5 (S.D. Ga. Aug. 9, 2022), *report and recommendation adopted*, No. CV 321-066, 2022 WL 3970838 (S.D. Ga. Aug. 31, 2022) ("[F]inding a medical opinion persuasive does not require the ALJ to fully incorporate that opinion into the RFC."); *Williamson*, 2022 WL 2257050, at *3.

While the ALJ did not specifically include limiting Plaintiff to carrying out "simple instructions," the record reflects that the ALJ properly evaluated the entire medical record,

including Dr. Estock's opinion, in limiting Plaintiff to doing "simple routine tasks but no complex tasks."   In finding the prior administrative medical finding persuasive, the ALJ noted that Dr. Estock "supported his opinions by citing relevant evidence, including [Plaintiff's] mental health treatment records, which generally noted no serious mental status abnormalities, and the mild cognitive symptoms associated with the claimant's seizure disorder."  (Tr. 23-24, 57-58). The ALJ also found that Dr. Estock's opinion was consistent with the results of Plaintiff's April 2019 psychological evaluation, which "demonstrated sufficient mental functioning to tolerate simple, routine tasks performed in a low stress environment with limited social interaction."  (Tr. 24, 522-528).  Earlier in the ALJ's decision, the ALJ cited the April 30, 2019 psychological evaluation and concluded that the evidence supported limiting Plaintiff "to simple, routine tasks, no complex tasks, occasional decision-making, and no fast-paced production work." (Tr. 22-23, 525-27).  The ALJ further cited examination records from February 7, 2019 and concluded that the evidence suggested that Plaintiff "could perform simple work tasks in a low-stress work environment in spite of her mental impairments."  (Tr. 22, 426-27).

The ALJ also found that Plaintiff was moderately limited in concentrating, persisting or maintaining pace.  (Tr. 19).[5]  The ALJ noted that Plaintiff's attention and concentration were intact on examination on multiple occasions, that she was cooperative and made good effort during testing, that she was not distractible, and that she maintained focus on the task at hand.  (Tr. 19, 328, 332, 335, 338, 341, 344, 347, 350, 419, 423, 427, 430, 434, 437, 441, 445, 449, 485, 489, 493, 501, 505, 509, 512, 515, 518, 526).  Dr. Estock also opined that Plaintiff was only moderately limited in the area of concentrating, persisting, or maintaining pace, and in the ability to carry out detailed instructions, but that Plaintiff was not significantly limited in carrying out very short and

_____

[5] Plaintiff did not challenge this finding.

14

simple instruction.  (Tr. 53, 59).  The ALJ incorporated into the RFC "the degree of limitation the [ALJ] ... found in the ... mental function analysis" by limiting Plaintiff to simple routine tasks. (Tr. 20).  "Where supported by medical evidence, moderate limitations in concentration, persistence, or pace can ... be accounted for by limiting claimant to simple tasks." *James C. v. Comm'r, Soc. Sec. Admin.*, No. 1:17-CV-00884, 2018 WL 6137611, at *3 (N.D. Ga. Sept. 29, 2018); s*ee Neefe v. Comm'r of Soc. Sec.*, 531 F. App'x 1006, 1007 (11th Cir. 2013) (limiting to simple tasks or unskilled work); *Thornton v. Comm'r, Soc. Sec.*, 597 F. App'x 604, 612 (11th Cir. 2015) (limiting to simple, non-detailed tasks); *Szilvasi v. Comm'r, Soc. Sec. Admin.*, 555 F. App'x 898, 902 (11th Cir. 2014) (limiting to simple, repetitive tasks).  At the hearing, the ALJ asked the VE whether jobs existed in the national economy for an individual with the Plaintiff's age, education, work experience, and RFC, and the VE testified that Plaintiff would be able to perform unskilled work[6] as a janitor, laundry worker, and dishwasher.  (Tr. 25, 42-44).

"Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time."  20 C.F.R. § 404.1568(a).  Thus, "[b]y definition, unskilled jobs require no more than simple tasks." *James C.*, 2018 WL 6137611, at *5; *Vuxta v. Comm'r of Soc. Sec.*, 194 F. App'x 874, 878 (11th Cir. 2006) ("a limitation to simple tasks is already contained within the unskilled limitation").  Unskilled work generally requires the following: (1) "[u]nderstanding, remembering, and carrying out simple instructions"; (2) "[m]aking judgments that are commensurate with the functions of unskilled work--i.e., simple work-related decisions"; (3) "[r]esponding appropriately to supervision, co-workers and usual work situations"; and (4) "[d]ealing with changes in a routine work setting." SSR 96-9p,

---

[6] The court notes that in determining Plaintiff's RFC, the ALJ did not specifically limit her to unskilled work.  (Tr. 20).

1996 WL 374185, at *9 (S.S.A. July 2, 1996); *see also* SSR 85-15, 1985 WL 56857, at *4 (S.S.A. 1985) ("The basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting."). *See Washington v. Berryhill*, 2018 WL 3078763, at *7 (S.D. Ala. June 20, 2018) (citing *Anderson v. Astrue*, No. 2:11-00046, 2011 WL 3843683, at *3 (S.D. Ala. Aug. 30, 2011)) (finding that the Social Security Regulations "read together, establish that unskilled work requires the ability to understand, carry out, and remember simple instructions and duties ... "); *see also Hess v. Comm'r Soc. Sec.*, 931 F.3d 198, 210-11 (3d Cir. 2019) ("A limitation to 'simple tasks' is fundamentally the same as one 'to jobs requiring understanding, remembering, and carrying out only simple instructions and making only simple work-related decisions[.]'") (collecting cases).

The record reflects that the ALJ had substantial evidence to limit Plaintiff to simple routine tasks, which equated to unskilled work.  In determining Plaintiff's RFC, the ALJ stated that the ALJ had carefully considered the entire record including the medical opinions and prior administrative medical findings.  (Tr. 20).  Dr. Estock opined that Plaintiff was moderately limited as to her concentration, persistence, and pace, and in the ability to carry out detailed instructions. The ALJ's decision not to include simple instructions as a limitation in the RFC was supported by substantial evidence. *See Williamson*, 2022 WL 2257050, at *4 n.6 (citing *Matos v. Comm'r of Soc. Sec.*, 2022 WL 97144, at *7 (11th Cir. 2022)) (where the court found unpersuasive the plaintiff's argument that the ALJ erred in limiting her to simple tasks instead of simple instructions in her RFC because "the decision not to include a limitation to only simple instructions" was supported by substantial evidence where state agency psychologists found that she was "only

moderately limited in her ability to carry out detailed instructions"); *James C.*, 2018 WL 6137611, at *5 (noting the "well-established [Eleventh Circuit] precedent that claimants with moderate limitations in concentration, persistence, and pace can do unskilled work and handle simple instructions when medical evidence supports those limitations") (collecting cases); *Robinson v. Comm'r of Soc. Sec.*, No. 6:17-CV-1619, 2019 WL 118031, at *4 (M.D. Fla. Jan. 7, 2019) ("[T]he Court finds that the ALJ's determination that Claimant can perform simple, routine, and repetitive tasks adequately accounts for [examining doctor's] opinion that Claimant is moderately limited in her ability to understand and remember simple instructions, carry out simple instructions, and make judgments on simple work-related decisions."); *Williamson*, 2022 WL 2257050, at *4 ("By limiting [the plaintiff] to unskilled work, the ALJ implicitly found that [the plaintiff] had the mental capacity to understand, carry out, and remember simple instructions.").

Plaintiff also argues that the jobs cited by the VE (Tr. 25), which all require a reasoning level of two, cannot be performed by someone with her RFC.  (Doc. 14 at p. 9).  Specifically, Plaintiff argues that her RFC does not comport with a reasoning level two job, which requires the ability "to carry out detailed but uninvolved written or oral instructions."  (*Id.*).  *See* DOT Appendix C – Components of the Definition Trailer, 1991 WL 688702 (4th ed. rev'd Jan. 1, 2016). Instead, Plaintiff asserts that Dr. Estock's opinion that Plaintiff "could understand and remember simple 1-2 step instructions but not detailed ones" corresponds to a job with a reasoning level of one, which requires the ability to "[a]pply commonsense understanding to carry out simple one- or two-step instructions."  (Doc. 14 at p. 9).  *See* DOT App'x C, 1991 WL 688702.  However, "[t]he Eleventh Circuit and courts within it have found that a limitation to simple, routine, and repetitive tasks/work is not inconsistent with a reasoning level two job."  *Williamson*, 2022 WL 2257050, at *4 (citing *Valdez v. Comm'r of Soc. Sec.*, 808 F. App'x 1005, 1009 (11th Cir. 2020));

17

*Pennington v. Kijakazi*, No. 3:20-cv-434, 2022 WL 816076, at *9 (M.D. Ala. Mar. 17, 2022) (finding that plaintiff's RFC, which included a limitation to "simple routine tasks involving no more than simple, short instructions and simple work-related decisions" was not inconsistent with level two reasoning jobs); *Riddle v. Colvin*, No. 1:12-cv-787, 2013 WL 6772419, at *6 (M.D. Ala. Dec. 20, 2013) (concluding that jobs with reasoning level two are consistent with an ability to perform simple, routine, and repetitive tasks). Thus, Plaintiff's limitation to "simple routine tasks" permits her to perform the reasoning level two jobs cited by the VE. *See Peterson v. Comm'r of Soc. Sec.*, No. 21-10086, 2021 WL 3163662, at *3 (11th Cir. July 27, 2021) ("[T]here is no apparent conflict between an RFC limitation to simple, routine, repetitive tasks and the DOT's description of jobs requiring level two reasoning."). "Further, the inherent limitations in unskilled work—i.e., the ability to understand, carry out, and remember short and simple instructions on a sustained basis—does not run afoul of level two reasoning jobs." *Williamson*, 2022 WL 2257050, at *5 (citing *Anderson*, 2011 WL 3843683, at *4) ("[T]here was no actual conflict between the [VE's] testimony that [the plaintiff] could perform the cited unskilled jobs and the applicable DOT information because all of the jobs have an SVP of 2, which correlates to unskilled work."). Thus, the reasoning level two jobs cited by the VE do not conflict with Plaintiff's RFC and are consistent with Dr. Estock's opinion.

> **b.      Lack of Limitation as to Quality and Proximity of Interaction**

As to Plaintiff's second contention, Plaintiff argues that limiting Plaintiff to "occasional interaction with the public, coworkers, and supervisors, no interaction with public, and no fast-paced production work such as conveyor belt or quota-based work" only addresses the amount of interaction Plaintiff could have with coworkers, supervisors, and the public, while Dr. Estock also limited the quality and proximity of interaction. (Doc. 14, at p. 10; Tr. 20, 23). In support, Plaintiff

cites to Dr. Estock's opinion in which he stated that Plaintiff "should avoid: close coordinated work with others... . Contact with the public should be non-intensive, limited... . Contact with a few well known coworkers should be casual. The claimant would be expected to have occasional (less than one third of the time per month) conflicts with coworkers." (*Id.*, citing Tr. 60-61).

But as stated previously, the ALJ was not obligated to adopt the entirety of Dr. Estock's opinion, which the ALJ found "generally persuasive." The record reflects that the ALJ considered Dr. Estock's opinion along with the record as a whole in determining Plaintiff's RFC. Particularly, the ALJ considered the April 2019 psychological evaluation, which demonstrated that Plaintiff could perform simple, routine tasks in a low stress environment with limited social interaction. (Tr. 24, 522-528). Further, Dr. Estock found that Plaintiff's ability to work in coordination or in proximity to others without being distracted by them and her ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes was not significantly limited. (Tr. 59, 60). As noted by the ALJ, Dr. Estock also opined that Plaintiff "would function best with her own work area/station without close proximity to others." (Tr. 23, 60). However, Dr. Estock did not state that Plaintiff required her own work area/station without close proximity to others— only that she would "function best." Thus, the ALJ did not err by leaving out that limitation. *See Whitten v. Soc. Sec. Admin., Comm'r*, 778 F. App'x 791, 796 (11th Cir. 2019) ("[State agency medical consultant] said only that [plaintiff] would function 'best' in a well-spaced work setting; he did not say that she required a well-spaced work setting to function at all. Thus, the ALJ did not err by leaving out that limitation."); *Jones v. Berryhill*, No. CV 117-106, 2018 WL 6537154, at *6 (S.D. Ga. Nov. 19, 2018), *report and recommendation adopted*, No. CV 117-106, 2018 WL 6531660 (S.D. Ga. Dec. 12, 2018) (noting that the one-time consultative psychologist only noted that the plaintiff "'may function best with solitary work task' not that her ability to work with

supervisors and coworkers would be significantly impaired"); *Hall v. Kijakazi*, No. CV 321-071, 2022 WL 18283262, at *9 (S.D. Ga. Dec. 20, 2022), *report and recommendation adopted*, No. CV 321-071, 2023 WL 186868 (S.D. Ga. Jan. 13, 2023) (noting that consultative psychologist's statement that the plaintiff would function "best" was not equivalent to requiring minimal interaction to function at all).

Further, the ALJ also considered treatment records from Grace Point Behavioral and the April 30, 2019 psychological evaluation in determining that Plaintiff was "limited to occasional interaction with supervisors and coworkers and no interaction with the public." (Tr. 23, 24, 341, 422, 496, 517, 524, 528). Additionally, the ALJ concluded that "more restrictive social limitations [were] not supported by the evidence." (Tr. 23). Accordingly, the record reflects that the ALJ properly considered Dr. Estock's opinion in conjunction with the rest of the record in determining Plaintiff's RFC. *See Matos*, 2022 WL 97144, at *6 (where plaintiff argued that the ALJ's finding that plaintiff had the RFC to "occasionally interact with supervisors, coworkers, and the public" conflicted with state psychologists who opined that plaintiff could have only "limited and superficial social interaction," the court, in affirming the ALJ, noted that ALJ stated that she had carefully considered the entire record including the medical opinions and prior administrative medical findings. that the state agency psychologists opined that plaintiff was no more than moderately limited as to her concentration, persistence, ability to interact socially, and ability to adapt, and that the ALJ's decision incorporated limitations to plaintiff's social interaction, which limited her to "occasional" interaction with others); *Hall*, 2022 WL 18283262, at *8-9 (S.D. Ga. Dec. 20, 2022) (despite a state agency consultative examiner's finding that plaintiff had marked impairment in interacting with others, the court found that the ALJ considered other evidence and

sufficiently accounted for the plaintiff's limitations in interacting with others, including supervisors, by restricting the plaintiff to occasional interaction with others).

Here, the ALJ properly determined Plaintiff's RFC from Dr. Estock's opinion and the evidence as a whole, and the ALJ was not bound to adopt every restriction in Dr. Estock's opinion simply because the opinion was found to be "generally persuasive." *See Tolbert*, 2022 WL 4591646, at *2. For the reasons stated above, the ALJ's RFC determination was based on substantial evidence.

### 3. Evaluation of Dr. Amason's Prior Administrative Finding

Plaintiff contends that despite finding Dr. Amason's opinion "persuasive" the ALJ did not explain the rationale for not including certain "environmental limitations" into Plaintiff's RFC, specifically commercial driving or working around large bodies of water. (Doc. 14 at p. 11, citing Tr. 23, 57). Plaintiff argues that the ALJ did not explain or provide reasons why this portion of Dr. Amason's opinion was not included in the RFC and that without an explanation there is no way for a reviewing court or Plaintiff to know whether the ALJ intended to adopt Dr. Amason's findings or if the ALJ intended to discredit or find unpersuasive that portion of Dr. Amason's opinion. (Doc. 14 at p. 11).

In considering Dr. Amason's opinion, the ALJ noted that "Dr. Amason supported his opinions by citing relevant medical evidence, including the claimant's conservative treatment history, diagnostic imaging of her knees, and physical examination results." (Tr. 23, 52, 57-58). The ALJ found that these opinions were "consistent with more recent evidence available at the hearing level." (Tr. 23). The ALJ also considered treatment records, noting that Plaintiff did not allege that her neurological complaints were disabling and stated that the RFC accounted for Plaintiff's seizure disorder by limiting her exposure to heights and hazards. (Tr. 21). The ALJ

was not required to incorporate the entirety of Dr. Amason's opinion merely because the ALJ found it persuasive.  The ALJ evaluated Dr. Amason's opinion along with the record as a whole.  In the section of Dr. Amason's opinion that states, "Explain environmental limitations and how and why the evidence supports your conclusions.  Cite specific facts upon which your conclusions are based," Dr. Amason did not explain the bases for the environmental limitations, but instead only listed the limitations as follows: "no unprotected heights, hazardous machinery, commercial driving, or work around large bodies of water."  (Tr. 57).  Plaintiff does not cite to any evidence in support of Dr. Amason's environmental limitations.  Based upon this record, the court concludes that the ALJ properly evaluated Dr. Amason's prior administrative findings under the regulations and that the ALJ's omission of the environmental limitations is supported by substantial evidence.

Moreover, even if the ALJ did err, such error was harmless.  Plaintiff fails to establish how the limitations of commercial driving or working around large bodies of water would preclude her from being able to perform the jobs of janitor, laundry worker, and dishwasher.  The DOT functional descriptions for the three jobs identified by the VE do not appear to involve driving or indicate that exposure to large bodies of water is involved.  *See* DICOT 381.687-018, 1991 WL 673258 (Janitor); DICOT 361.684-014, 1991 WL 672983 (Laundry Worker I); DICOT 318.687-010, 1991 WL 672755 (Kitchen Helper or Dishwasher).  Plaintiff makes no argument that the essential function of any of these jobs includes commercial driving or being around large bodies of water.  Thus, even if the ALJ had incorporated limitations to commercial driving or working around large bodies of water into the RFC, Plaintiff's RFC would have still permitted her to work in those three positions.  Therefore, the ALJ's failure to include these limitations was harmless.  *See Jones v. Comm'r of Soc. Sec.*, 492 F. App'x 70, 73 (11th Cir. 2012) (failure to include driving limitation in hypothetical was harmless as the essential function of the jobs identified by the VE

22

did not include driving); *Caldwell v. Barnhart*, 261 F. App'x 188, 190 (11th Cir. 2008); *Maye v. Berryhill*, No. 6:18-CV-679, 2019 WL 2755030, at *5 (M.D. Fla. July 2, 2019); *Davis v. Berryhill*, 272 F. Supp. 3d 154, 180 (D.D.C. 2017) (citing *Mellgren v. Colvin*, No. 2:14-CV-00387, 2015 WL 5021725, at *5-6 (E.D. Wash. Aug 24, 2015)); *Reese v. Astrue*, No. ED CV 11-540, 2012 WL 137567, at *9 (C.D. Cal. Jan. 17, 2012) (finding that even if the ALJ erred by omitting the limitations of having to avoid extreme heat, exposure to dangerous or moving machinery, and working around pools of water, or that of not having responsibility for the safety of others, from plaintiff's RFC determination, such error would be harmless as plaintiff would still be able to perform the jobs identified by the VE with such limitations).

## B. Consideration of Plaintiff's Mild Neurocognitive Disorder

Plaintiff contends that the ALJ improperly substituted her opinion for that of a medical professional by importing Social Security's legal definition of the term "mild" into the diagnosis of "Mild Neurocognitive Disorder," that the ALJ failed to find that her neurocognitive disorder was a severe impairment, that the ALJ's misinterpretation of the term "mild" rendered the findings of the 12.00 "paragraph B" criteria unsupported by substantial evidence, and that the ALJ's misinterpretation of the term "mild" rendered the finding of Plaintiff's RFC unsupported by substantial evidence.  (Doc. 14 at pp. 11, 14, 15).  The Commissioner contends that the ALJ properly considered Plaintiff's "provisional" diagnosis of mild neurocognitive disorder without behavioral disturbance due to multiple etiologies at each stage in the sequential evaluation process. (Doc. 17 at p. 11).

### 1. The ALJ's Consideration of Mild Neurocognitive Disorder

In the ALJ's decision, the ALJ stated, in part:

According to IQ testing, the claimant's full scale IQ is 63, which is in the extremely low range, and her scores on memory tests are in the borderline to average range

(Ex. B15F/5-6). Nevertheless, she received a provisional diagnosis of "Mild Neurocognitive Disorder without Behavioral Disturbance due to Multiple Etiologies" (Ex. B15F/7). As her neurocognitive disorder was deemed only mild, this suggests that her low test scores do not correlate with marked or extreme functional limitations.

(Tr. 19).

Plaintiff argues that the ALJ's opinion was improperly substituted for that of a medical professional by importing Social Security's legal definition of the term "mild" into the diagnosis of "mild neurocognitive disorder." (Doc. 14 at p. 12). Plaintiff asserts that the medical term "mild" as used in the medical community does not carry the same definition as Social Security's legal definition, which defines "mild" as describing an impairment that is not severe, i.e., does not create any more than a "minimal limitation in [the claimant's] ability to do basic work activities." (*Id*., citing 20 C.F.R. § 404.1520a(d)(1)). Plaintiff cites the Diagnostic and Statistical Manual of Mental Disorders Fifth Edition (DSM-V), DSM5TH S2H17[7], as providing examples of the severity of symptoms or limitations created by mild neurocognitive disorder. (*Id*. at pp. 12-13).

The DSM states that "DSM-5 recognizes a less severe level of cognitive impairment, mild neurocognitive disorder, which can also be a focus of care, and which in DSM-IV was subsumed under 'Cognitive Disorder Not Otherwise Specified.'" DSM5TH S2H17; p. 591. The DSM provides a table, which sets forth differences between mild and major neurocognitive disorder. *See id*. The table provides for each of the key domains a working definition and examples of symptoms or observations regarding impairments in everyday activities. *Id*. at p. 592. The table states, in part, as follows:

Complex attention . . .

*Major*: Has increased difficulty in environments with multiple stimuli (TV, radio, conversation); is easily distracted by competing events in the environment. Is

---

[7] https://dsm.psychiatryonline.org/doi/epdf/10.1176/appi.books.9780890425596

unable to attend unless input is restricted and simplified. Has difficulty holding new information in mind, such as recalling phone numbers or addresses just given, or reporting what was just said. Is unable to perform mental calculations. All thinking takes longer than usual, and components to be processed must be simplified to one or a few.

*Mild*: Normal tasks take longer than previously. Begins to find errors in routine tasks; finds work needs more double-checking than previously. Thinking is easier when not competing with other things (radio, TV, other conversations, cell phone, driving).

Executive function . . .

*Major*: Abandons complex projects. Needs to focus on one task at a time. Needs to rely on others to plan instrumental activities of daily living or make decisions.

*Mild*: Increased effort required to complete multistage projects. Has increased difficulty multitasking or difficulty resuming a task interrupted by a visitor or phone call. May complain of increased fatigue from the extra effort required to organize, plan, and make decisions. May report that large social gatherings are more taxing or less enjoyable because of increased effort required to follow shifting conversations.

Learning and memory . . .

*Major*: Repeats self in conversation, often within the same conversation. Cannot keep track of short list of items when shopping or of plans for the day. Requires frequent reminders to orient to task at hand.

*Mild*: Has difficulty recalling recent events, and relies increasingly on list making or calendar. Needs occasional reminders or re-reading to keep track of characters in a movie or novel. Occasionally may repeat self over a few weeks to the same person. Loses track of whether bills have already been paid.

. . .

Language . . .

*Major*: Has significant difficulties with expressive or receptive language. Often uses general-use phrases such as "that thing" and "you know what I mean," and prefers general pronouns rather than names. With severe impairment, may not even recall names of closer friends and family. Idiosyncratic word usage, grammatical errors, and spontaneity of output and economy of utterances occur. Stereotypy of speech occurs; echolalia and automatic speech typically precede mutism.

*Mild*: Has noticeable word-finding difficulty. May substitute general for specific terms. May avoid use of specific names of acquaintances. Grammatical errors involve subtle omission or incorrect use of articles, prepositions, auxiliary verbs, etc.

Perceptual-motor . . .

*Major*: Has significant difficulties with previously familiar activities (using tools, driving motor vehicle), navigating in familiar environments; is often more confused at dusk, when shadows and lowering levels of light change perceptions.

*Mild*: May need to rely more on maps or others for directions. Uses notes and follows others to get to a new place. May find self lost or turned around when not concentrating on task. Is less precise in parking. Needs to expend greater effort for spatial tasks such as carpentry, assembly, sewing, or knitting.

Social cognition . . .

*Major*: Behavior clearly out of acceptable social range; shows insensitivity to social standards of modesty in dress or of political, religious, or sexual topics of conversation. Focuses excessively on a topic despite group's disinterest or direct feedback. Behavioral intention without regard to family or friends. Makes decisions without regard to safety (e.g., inappropriate clothing for weather or social setting). Typically, has little insight into these changes.

*Mild*: Has subtle changes in behavior or attitude, often described as a change in personality, such as less ability to recognize social cues or read facial expressions, decreased empathy, increased extraversion or introversion, decreased inhibition, or subtle or episodic apathy or restlessness.

*Id*. at pp. 593-95.

As an initial matter, the table provides significant differences between "mild" and "major." Here, the record reflects that the ALJ did not rely solely on the term "mild" in reaching conclusions, as the ALJ considered other evidence in the record, including other objective medical findings, Plaintiff's activities, and treatment history. In examining Plaintiff's mental impairments, the ALJ determined that Plaintiff experienced moderate limitations in each of the "Paragraph B" criteria. (Tr. 18-19). In addition to citing Plaintiff's "mild" neurocognitive disorder in finding Plaintiff was moderately limited in the area of "understanding, remembering or applying

26

information," the ALJ also noted that on examination, Plaintiff's "thought content was logical, with no psychotic intrusion." (Tr. 19, 525). The ALJ also noted that Plaintiff was "alert and oriented to person, place, time, and situation; [s]he could define common words, such as 'apple,' 'donkey,' 'bacon,' 'join,' 'nuisance,' 'plural,' 'recede,' and 'abundant,'" and that her "immediate and remote memory were good." (Tr. 19, 525).

With respect to "interacting with others," the ALJ noted that treatment records revealed that Plaintiff "was generally friendly and communicative; grooming was appropriate; speech was normal; and there were no signs of anxiety." (Tr. 19, 418, 423, 430, 434, 437, 441, 445, 449, 493, 497, 501, 505, 518). The ALJ further noted that Plaintiff left the house regularly, shopped in stores, spent time with others, and got along with authority figures. (Tr. 19, 173-76). As to "concentrating, persisting or maintaining pace," the ALJ stated that medical records showed that Plaintiff's attention and concentration were intact on examination on multiple occasions and that during testing, she was cooperative and made good effort, was not distractible, and maintained focus on the task at hand. (Tr. 19, 328, 332, 335, 338, 341, 344, 347, 350, 419, 423, 427, 430, 434, 437, 441, 445, 449, 485, 489, 493, 501, 505, 509, 512, 515, 518, 526). With regard to "adapting or managing oneself," the ALJ found that Plaintiff was independent in her activities of daily living and that she had not required inpatient psychiatric treatment. (Tr. 19, 163-65, 524). The ALJ also noted that Plaintiff lived at home with her son and that there was no evidence of a complete inability to function outside of the home, which demonstrated that there was no evidence that she required a highly structured setting or was incapable of adapting to changes in her environment. (Tr. 19, 523).

In assessing RFC, the ALJ noted that on January 8, 2018 Plaintiff underwent a comprehensive neurological examination and that the results were normal. (Tr. 21, 225). The ALJ stated that the results from an April 20, 2018 neuropsychological examination were "mildly abnormal." (Tr. 21, 204-05). The ALJ noted that there was some evidence of increased difficulty on measures of executive functioning, but the other domains were stable. (Tr. 21). Based upon Plaintiff's treatment history, the ALJ found that there was "no other evidence of neurological symptoms or treatment after the alleged onset date," and that the limited evidence of mild and inconclusive limitations did not establish that Plaintiff suffered from debilitating seizures or neurological impairment. (Tr. 21). The ALJ further noted that Plaintiff did not allege that her neurological complaints were disabling. (Tr. 21).

The ALJ also cited a February 7, 2019 examination, which showed that Plaintiff's "speech was normal, and language skills were intact; there were no apparent signs of hallucinations, delusions, bizarre behaviors, or psychosis; associations were intact; thinking was logical; thought content appeared relevant and appropriate; suicidal ideation was denied; insight and judgment appeared fair; there were no signs of hyperactivity or attentional difficulties; behavior was cooperative and attentive." (Tr. 22, 426-27). The ALJ noted that subsequent mental status examinations generally did not reveal any serious abnormalities. (Tr. 21, 493, 497, 501, 505). In addition to noting that Plaintiff's neurocognitive disorder was deemed mild, the ALJ reiterated that on examination Plaintiff's "thought content was logical, with no psychotic intrusion" and that Plaintiff was "alert and oriented to person, place, time, and situation" and that "[s]he could define common words, such as 'apple,' 'donkey,' 'bacon,' 'join,' 'nuisance,' 'plural,' 'recede,' and 'abundant,'" and that her "immediate and remote memory were good." (Tr. 19, 525). The ALJ also cited Dr. Estock's opinion as generally persuasive. (Tr. 23-24).

Based upon the record, the ALJ did not impermissibly substitute the Social Security Act's definition of "mild" for that used in the provisional diagnosis of mild neurocognitive disorder. The ALJ thoroughly discussed the entire medical record in determining the severity of Plaintiff's mental impairments and her RFC. The ALJ's determinations were based on substantial evidence.

### 2. Step Two of the Sequential Evaluation

Plaintiff contends that the ALJ erred at step two of the sequential evaluation process in not finding that her provisionally diagnosed mild neurocognitive disorder was a severe impairment and that the ALJ thus improperly held her to a higher standard than the law requires. (Doc. 14 at p. 14).

An impairment or combination of impairments is "severe" if it "significantly limits [the plaintiff's] physical or mental ability to do basic work activities"[8] and persists for at least twelve consecutive months. 20 C.F.R. §§ 404.1520(c) and 416.920(c); 404.1505(a) and 416.905(a). "[T]he mere diagnosis of [a condition] says nothing about the severity of the condition." *Crans v. Berryhill*, No. 3:16-CV-914, 2017 WL 4683933, at *5 (M.D. Ala. Oct. 18, 2017) (quoting *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988)). "[A] diagnosis or a mere showing of 'a deviation from purely medical standards of bodily perfection or normality' is insufficient; instead, the claimant must show the effect of the impairment on her ability to work." *Wind v. Barnhart*, 133 F. App'x 684, 690 (11th Cir. 2005) (quoting *McCruter v. Bowen*, 791 F.2d 1544, 1547 (11th Cir. 1986)). Plaintiff bears the burden to prove that an impairment is severe. *See Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001).

---

[8] Basic work activities are "the abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine work setting." 20 CFR §§ 404.1522(b), 416.922(b).

"Step two is a threshold inquiry," *McDaniel*, 800 F.2d at 1031, which acts as a "filter" to eliminate claims involving no substantial impairment, *Jamison v. Bowen*, 814 F.2d 585, 588 (11th Cir. 1987).  "If the ALJ finds a claimant does not have a 'severe' impairment or combination of impairments, she should conclude the claimant does not have a disability." *Vangile v. Comm'r, Soc. Sec. Admin.*, 695 F. App'x 510, 513 (11th Cir. 2017).  In the Eleventh Circuit, "the finding of any severe impairment, whether or not it qualifies as a disability and whether or not it results from a single severe impairment or a combination of impairments that together qualify as severe, is enough to satisfy the requirement of step two." *Id*.  When an ALJ recognizes at least one severe impairment, the ALJ is not required to identify additional impairments at step two if the decision demonstrates that the ALJ properly considered all impairments at subsequent steps.  *Tuggerson-Brown v. Comm'r of Soc. Sec.*, 572 F. App'x 949, 951 (11th Cir. 2014).  At the fourth step of the sequential evaluation process, an ALJ must consider all medically determinable impairments, not just the "severe" impairments identified at step two.  *Id*.; 20 C.F.R. §§ 404.1545(a)(2); 416.945(a)(2).  The ALJ's responsibility is met when she considers all medical evidence in the record by referencing the claimant's "combination of impairments" at step three and stating that she considered "all symptoms" in assessing the RFC.  *Tuggerson-Brown*, 572 F. App'x at 951-52. Importantly, the "mere existence" of an impairment does not reveal its effect on a claimant's ability to work or undermine RFC findings.  *Moore v. Barnhart*, 405 F.3d 1208, 1213 n.6 (11th Cir. 2005).

At step two in this case, the ALJ satisfied the requirements of the threshold inquiry by finding that Plaintiff has severe impairments, namely bipolar disorder, major depressive disorder/depression, generalized anxiety disorder/anxiety, somatic symptom disorder, epilepsy/seizure disorder, and patellofemoral chondromalacia. (Tr. 18); *see Jamison*, 814 F.2d at 588.  Because the ALJ found that Plaintiff has at least one severe impairment, the ALJ was not

required to identify all of Plaintiff's severe impairments before moving to step three of the sequential evaluation process.  *See Tuggerson-Brown*, 572 F. App'x at 951-52; *see Packer v. Comm'r, Soc. Sec. Admin.*, 542 F. A'ppx 890, 892 (11th Cir. 2013) ("[S]ince the ALJ proceeded beyond step two, any error in failing to find that [the claimant] suffers from the additional severe impairments of degenerative joint disease of the right knee or varicose veins would be rendered harmless.").

Although the ALJ did not err at step two, the court must still review whether or not the ALJ considered all of Plaintiff's impairments, regardless of severity, in performing the next steps of the sequential evaluation process.  As discussed previously, the ALJ considered Plaintiff's provisional diagnosis of "Mild Neurocognitive Disorder without Behavioral Disturbance due to Multiple Etiologies" when assessing Plaintiff's RFC.  (Tr. 21, 23-24).  Accordingly, based upon the entire record, the court concludes that the ALJ did not err in considering Plaintiff's alleged impairments at step two and that the ALJ adequately considered Plaintiff's provisional diagnosis of mild neurocognitive disorder in formulating the RFC.

### 3.   Step Three of the Sequential Evaluation

Plaintiff contends that the ALJ's misinterpretation of the term "mild" at step thee of the sequential evaluation process rendered the ALJ's findings of the 12.00 "paragraph B" criteria unsupported by substantial evidence.  (Doc. 14 at p. 14).  Plaintiff argues that in the area of "understanding, remembering or applying information" the ALJ found that Plaintiff had a moderate limitation by improperly discounting Plaintiff's valid full-scale IQ of 63 and stating, "As her neurocognitive disorder was deemed only mild, this suggests that her low test scores do not correlate with marked or extreme functional limitations." (*Id*. at pp. 14-15, citing Tr. 19).  Plaintiff asserts that the ALJ's discounting the effects of her condition based on the term "mild" shows that

the ALJ improperly considered her impairments singly and in combination when evaluating step three.  (*Id*. at p. 15).

The ALJ considered Listing 12.02 that pertains to neurocognitive disorders, which "are characterized by a clinically significant decline in cognitive functioning."  (Tr. 18-20); 20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 12.02.  This listing has two paragraphs, designated "A" and "B", and a claimant's mental disorder must satisfy the criteria of both paragraphs "A" and "B."  20 C.F.R. § Pt. 404, Subpt. P, App. 1 § 12.02.  To satisfy the criteria for Listing 12.02, a claimant must provide medical documentation of a significant cognitive decline from a prior level of functioning in one or more of the enumerated areas in "paragraph A," and extreme limitation in one, or marked limitation in two, of the enumerated areas in "paragraph B".  *Id*.[9]

The ALJ determined that Plaintiff only experienced "moderate" limitations in each of the "paragraph B" areas.  (Tr. 18-19).  The ALJ noted that despite Plaintiff's receiving a full-scale IQ score of 63, the examination conducted in conjunction with that test revealed less functional impairment than the test score suggested, as the examination showed: logical thought content with no psychotic intrusion; good immediate and remote memory; alertness; orientation; and the ability to define numerous common words.  (Tr. 19, 525).  Further, Plaintiff's examinations throughout the relevant period consistently showed no serious abnormalities and reflected that she was friendly and communicative and displayed intact attention and concentration.  (Tr. 19, 21-24).  The ALJ also noted that Plaintiff left the house regularly, shopped in stores, spent time with others, got

---

[9] As an alternative to fulfilling the "paragraph B" criteria, a claimant may fulfill the requirements of "paragraph C;" however, Plaintiff does argue that the paragraph C criteria were met.  (*See* Doc. 14 at 14-15).  In addressing "paragraph C," the ALJ found that the evidence established that Plaintiff lived at home with her son and that there was no evidence of a complete inability to function outside of the home and further that there was no evidence that she required a highly structured setting or was incapable of adapting to changes in her environment.  (Tr. 19).

along with authority figures, and was independent in her activities of daily living. (Tr. 19).

Based upon record as a whole, the court finds that the ALJ's decision on this issue is supported by substantial evidence.

### 4. Interpretation of the Term "Mild" in Conjunction with the RFC

Plaintiff argues that the ALJ's use of the term "mild" to discredit her IQ scores renders the RFC finding unsupported by substantial evidence, as Plaintiff's IQ score was more than three standard deviations below other adults. (Doc. 14 at p. 15, citing Tr. 526). Plaintiff cites the April 30, 2019 psychological evaluation, which noted that Plaintiff had "marked difficulty understating the instructions for the Spatial Addition subtest." (*Id.*).

This argument is essentially a rehash of the previous arguments that have already been addressed. As previously discussed, the record reflects that the ALJ thoroughly considered the entire record in determining Plaintiff's RFC and properly applied the regulations. Plaintiff "'must do more than point to evidence in the record that supports her position; she must show the absence of substantial evidence supporting the ALJ's conclusion.'" *Thompkins v. Kijakazi*, No. 2:21-CV-216, 2022 WL 2517185, at *7 (M.D. Ala. July 6, 2022) (quoting *Sims v. Comm'r of Soc. Sec.*, 706 F. App'x 595, 604 (11th Cir. 2017) (*per curiam*)); *Lanier v. Colvin*, No. CV414-004, 2015 WL 3622619, at *1 (S.D. Ga. June 9, 2015) ("The fact that Plaintiff disagrees with the ALJ's decision, or that there is other evidence in the record that weighs against the ALJ's decision, does not mean that the decision is unsupported by substantial evidence.") (citing *Crawford*, 363 F.3d at 1158-59). Put most simply, "[t]o the extent Plaintiff disagrees with the ALJ's interpretation of that evidence, that is not a ground for remand." *Horne v. Comm'r of Soc. Sec.*, No. 2:20-CV-181, 2021 WL 3023679, at *5 (M.D. Fla. June 28, 2021), *report and recommendation adopted*, No. 2:20-CV-181, 2021 WL 3022727 (M.D. Fla. July 16, 2021) (citing

*Sarria v. Comm'r of Soc. Sec.*, 579 F. App'x 722, 724 (11th Cir. 2014)); *Mitchell v. Comm'r, Soc. Sec. Admin.*, 771 F.3d 780, 782 (11th Cir. 2014) ("'We may not decide the facts anew, reweigh the evidence, or substitute our judgment for that of the Commissioner.' 'If the Commissioner's decision is supported by substantial evidence, this Court must affirm, even if the proof preponderates against it.'") (citations omitted).

## V.     Conclusion

After carefully and independently reviewing the record, and for the reasons stated above, the court concludes that the Commissioner's decision is due to be **AFFIRMED**.  A separate judgment will issue.

**DONE** this the 29th day of March 2023.

_____
**CHAD W. BRYAN**
**UNITED STATES MAGISTRATE JUDGE**

34